**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BENNIE ANDERSON** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **N0.  13-0903** |
| | : | |
| **WARDEN OF BERKS COUNTY** | : | |
| **PRISON and MR. JOE HERMAN** | : | |

**<u>MEMORANDUM OPINION</u>**

**Savage, J.**                                                                                  **January 8, 2014**

        Bennie Anderson ("Anderson"), a state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that the Warden of Berks County Jail ("Warden")[1] and Joe Herman ("Herman"), a caseworker at the jail, violated his Eighth Amendment right to be free from cruel and unusual punishment.  Anderson, who is serving a life sentence in a state correctional facility, contends that while temporarily housed at the Berks County Jail for twenty eight days as a defense witness during the penalty phase of an unrelated murder trial, he was placed in disciplinary status in a restricted housing unit.  During the four weeks he was there, he was fed nutri-loaf three times a day, had his mattress removed during daytime hours, had hygiene restrictions, was provided no blanket or warm clothing in his cold cell, and was deprived of sleep. He complains that he did nothing to warrant being treated as a disciplinary prisoner.

---

        [1] The Warden is not mentioned by name in the pleadings. However, Anderson's written communication forms addressed to the Warden, marked as Exhibits IV, V, and VIII to the amended complaint, show the Warden's name as "G. Wagner."

The threshold issue in this matter is not whether the conditions imposed upon Anderson were merited.  The question is whether those conditions amounted to cruel and unusual punishment in violation of the Constitution.

Drawing all reasonable inferences in Anderson's favor, we conclude that there are no genuine issues of material fact.  Anderson has failed to establish the essential elements of a cause of action for an Eighth Amendment violation.  Therefore, because no reasonable trier of fact could find that Anderson's Eighth Amendment rights to be free from cruel and unusual punishment had been violated, we shall grant summary judgment in favor of the defendants.[2]

## Procedural Background

On October 4, 2012, Anderson filed his complaint in the United States District Court for the Middle District of Pennsylvania.[3]  On February 19, 2013, after dismissing certain defendants for lack of personal involvement in the alleged mistreatment, the Middle District transferred the action against the remaining defendants to this district.[4]  Upon transfer, we dismissed the complaint without prejudice for failure to allege the defendants' personal involvement in the alleged mistreatment.[5]

---

[2] On August 21, 2013, we converted the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) to a motion for summary judgment because the defendants raised issues beyond the complaint.  *See* Aug. 21, 2013Order (Doc. No. 18).

[3] The defendants in the original complaint included the Superintendent of State Correctional Institution-Huntington ("SCI-Huntington"), the SCI-Huntington Deputy Superintendents, the Counselors at SCI-Huntington, the Warden of Berks County Prison, the Deputy Wardens of Berks County Prison, six unknown Correctional Officers in Berks County Prison, and two unknown counselors in the Berks County Prison.  Compl., No. 12-1991 (M.D. Pa. Oct. 4, 2012).

[4] Order, No. 12-1991 (M.D. Pa. Feb. 19, 2013).

[5] Feb. 26, 2013 Order (Doc. No. 2).

On March 14, 2013, Anderson filed an amended complaint against the Warden, Herman, unknown "Restricted Housing Guards from Third Shift," and unknown "Restricted Housing Guards from First Shift."  On May 7, 2013, all unknown defendants were dismissed, leaving the Warden and Herman as the only defendants.[6]

The defendants moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  The Warden and Herman argue that Anderson's claims do not constitute cruel and unusual punishment.  Additionally, they contend that Anderson has not alleged sufficient personal involvement to establish their culpability, and that they are entitled to qualified immunity.  In response, Anderson reiterates his allegations and contends the defendants were personally involved in his mistreatment.

Because the defendants raised factual matters outside the complaint, we notified the parties that the motion to dismiss was being converted to one for summary judgment.[7]  See Fed. R. Civ. P. 12(d).  In support of the motion for summary judgment, the defendants filed a statement of undisputed material facts on September 6, 2013.  Anderson, in response, filed a statement of disputed facts on October 15, 2013.[8]

On the same day, Anderson also filed a motion for summary judgment.[9]  The motion does not include any new facts. Anderson contends that he should receive summary judgment based on the facts alleged in his amended complaint.

---

[6] May 7, 2013 Order (Doc. No. 10).

[7] Aug. 21, 2013 Order (Doc. No. 18).

[8] Except for a few facts recited in the defendants' Statement of Undisputed Facts ("DSUF"), Anderson does not proffer facts or evidence disputing the defendants' facts.  He either denies defendants' statements without explanation or makes speculative arguments without addressing the defendants' version of facts.

[9] See Pl.'s Mot. for Summ. J. (Doc. No. 25).

At our request,[10] the parties filed supplemental submissions to address and provide evidence with respect to certain allegations in Anderson's amended complaint.[11]

**Facts**

Anderson alleges he was a model prisoner while housed in the general population at the State Correctional Institution-Huntington ("SCI-Huntington").[12]  On July 25, 2012, he was temporarily transferred to Berks County Jail to testify as a defense witness during the penalty phase of an unrelated capital murder trial in Berks County Court.   Upon arrival at Berks County Jail, Anderson was immediately placed in the restricted housing unit.[13]  He suggests that this placement was because the victim in the murder case was an interpreter who was well known and liked by jail staff.[14]  Yet, he does not challenge the defendants' statement that he was placed in administrative segregation because he was serving a life sentence for murder in the state prison from which he was temporarily transferred.[15]  Nor does he dispute that, unlike other prisoners in the unit, he had privileges, such as limited phone calls, access to bathing supplies and a restricted commissary menu.[16]

---

[10] *See* Nov. 19, 2013 Order (Doc. No. 28).

[11] *See* Pl.'s Supp'l Br. (Doc. No. 29); Defs'. Supp'l Statement of Undisputed Material Facts ("Defs'. Supp'l Statement") (Doc. No. 31); Pl.'s Resp. to Defs'. Supp'l Statement (Doc. No. 32).

[12] Pl.'s Opp. to Defs'. Mot. to Dismiss Pl.'s Am. Compl. at 1 ("Pl.'s Opp.").

[13] Am. Compl. at 10.

[14] *Id.* at 10-11.

[15] DSUF, ¶¶ 14, 18.

[16] *Id.* ¶ 16.

Anderson complains that the conditions imposed as a result of undeserved disciplinary status amounted to cruel and unusual punishment.[17]  He does not address the defendants' statement that he was placed in administrative segregation because he was identified as a security risk to the general population due to his sentence of life imprisonment as a result of a murder conviction.[18]

Anderson claims prison officials regularly harassed and threatened to beat him if he testified on the defendant's behalf.[19]  He contends that while housed at the jail in the restricted housing unit, he was fed only "nutri-loaf," an unappetizing meal substitute usually used as a disciplinary measure; his mattress was removed from 6:30 a.m. to 8:30 p.m. each day, leaving him with a concrete slab to sit on; and, he was deprived of a blanket, pillow, shower, shaving privileges, and pen and paper.[20]  He also complains that his cell, which had a single window on the door, was kept dark for most of the day and that light was only available three hours per day, from 8:00 p.m. to 11:00 p.m.[21]  Then, after 11:00 p.m., prison guards regularly kicked his door, shouted at him, and physically threatened him, causing sleep deprivation.[22]   They also kept his cell

---

[17] Anderson arrived at the Berks County Jail with a history of misconducts in the state prison system.  *See* DSUF, Ex. 2 at 28-30 (Pennsylvania Department of Corrections Misconducts).  This history did not appear to influence the decision to place him in the restricted housing unit.  He was designated to administrative segregation status not for disciplinary reasons, but due to his status as a convicted murderer serving a life sentence.  *See* DSUF, ¶ 14.

[18] DSUF, ¶¶ 18-20.

[19] Am. Compl. at 18; Pl.'s Opp. at 2.

[20] Am. Compl. at 11-14.

[21] *Id.* at 11-13.

[22] *Id.* at 18-19.  Anderson specifies times of "1 a.m., 2 a.m., etc."

extremely cold.[23]   The cell temperature and the lack of a blanket, Anderson alleges, also caused sleep deprivation and resulted in his physical illness, for which he was given medication.[24]

Anderson imputes individual responsibility for these conditions to the Warden and Herman because the Warden directed his treatment and they both failed to take corrective action after verbal and written complaints.   Anderson alleges that he verbally complained to Herman about his disciplinary status.   He explained that "the outrageous treatment he was forced to endure was uncalled for because [he] was in the prison only because he was a witness for the Public Defender's client" and not because he had broken any rules.[25]   He also alleges that Herman was made aware of the "cruel and unusual punishing conditions."[26]   According to Anderson, Herman advised him that these conditions were "out of his hands and there was nothing he could do."[27]

With regard to the Warden's personal involvement, Anderson alleges the Warden inspected his unit every week, so he was aware of the way he was being treated.   He also argues that this undesirable treatment was meted out at the Warden's instruction.[28]

To support his claim of personal involvement, Anderson included as exhibits to his amended complaint three inmate communication forms with the Warden and two

---

[23] *Id.* at 18.

[24] *Id.* at 12.  None of Anderson's attached exhibits relate to this sickness.

[25] *Id.* at 15.

[26] *Id.* at 16.

[27] *Id.* at 15.

[28] *Id.* at 14.

grievance forms.[29]   These forms and an unrelated medical communication form are summarized below.

 1.  *First Warden Communication*

The first warden communication is dated July 27, 2012:

> I came here from a state jail for court (witness).  I am being treating [*sic*] as if I've broken every rool [*sic*] in the jail.  I [*sic*] been placed in a cold cell. They tell me I'm only allowed one blanket[,] no pillow.  I've had no shower – shave – yard.  I've been told I can only shave [and] shower on [whatever] day I go to court – until then I'm to sit around unshaven [and] dirty.  This is surely [unnecessary] and [unusual] punishment.  If anything I should be on AC status no [*sic*] [disciplinary].  When I came here I was in population.  I need to have something done about me being able to clean myself, shave, and not catch a cold.[30]

The Warden responded three days later disputing Anderson's disciplinary status by stating "You are in modified security status.  This status is reviewed regularly.  You had a shower on 7-29-12 – and you were not scheduled for court!"[31]

 2.  *Second Warden Communication*

The second warden communication is dated August 1, 2012:

> I just received an inmate handbook on 7-31-12 on No. 6 page 20 – 21 – 22 – 23.  It speaks of classification custody level Administrative – Disciplinary – Reentry.  It do [*sic*] not say anything about a modified security level, as you say I'm under.  However, since the officers tells [*sic*] me that while I'm in this disciplinary unit I can only receive and be given the same things and treatment as those that are on disciplinary status – your orders as I was told.   How do I receive the things outside of disciplinary status, such as commissary (food) shaving regularly, ect [*sic*].[32]

---

[29] These exhibits were also included in Anderson's original complaint.

[30] Am. Compl., Ex. IV; DSUF, Ex. 2 at 38.  Inmate communication forms are designated for the Warden by checking a box next to "Warden" at the top of the form.

[31] *Id.*  The Warden's response is written at the bottom of Anderson's original communication form.

[32] *Id.*, Ex. V; DSUF, Ex. 2 at 37.

The Warden responded on August 6, 2012: "Mr. Anderson – Quoting from the Handbook, telling me what an unnamed officer supposedly told you . . . .  These things are simultaneously irrelevant and unnecessary; just ask the darn question.  You will not get full commissary privilege."[33]  Immediately thereafter was the following note: "Lt. Smith – Mr. Anderson is on modified security status.  Insure [*sic*] he has access to the restricted commissary menu, bathing supplies (shaving), limited phone call opportunities, etc."[34]

3.  *Medical Communication*

On August 2, 2012, Anderson wrote to the medical department about obtaining his medication for a preexisting "sariacis [*sic*] [psoriasis]" condition.[35]  He alleged that he had not received medication since his arrival on July 25, 2012, that he had put in a sick call on July 27, 2012, and that his symptoms included "breaking out again" on his feet, knee, and ankles, with pain and swelling.[36]  On August 7, 2012, medical staff responded that he was scheduled to see a sick call nurse.[37]   Anderson does not allege mistreatment regarding this event.

---

[33] *Id.*

[34] *Id.*, Ex. V.  At the bottom of the form, "Lt. Smith" was written in under "CC:".

[35] *Id.*, Ex. VI; DSUF, Ex. 2 at 36.

[36] *Id.*

[37] *Id.*

### 4. First Grievance

Anderson filed a grievance form complaining about his disciplinary status and various conditions of imprisonment on August 13, 2012.[38]  Although not entirely legible, he mentions "meal loaf," "mattress taken," no "pillowcase" or "pillow," and "as of this date no haircut or shave."[39]  He also mentions that the inmate handbook allows inmates with life sentences to be placed under administrative segregation in C-Block, whereas he had been "placed in the back of D-Block in the Behavior [Adjustment] Unit" after 19 days in the prison and no rule violations.[40]  Anderson had recently been transferred from cell number D-101 to D-124.[41]  Regarding this housing decision, he asks, "Why, [and] Why Now?"[42]

On August 16, 2012, Lieutenant Castro responded to Anderson's grievance by saying, "You are currently on modified security status.  This means you receive regular meals, no mattress restrictions, and Sunday phone calls.  This status is Administrative Segregation."[43]  After instructions about haircuts and shaving, the response concludes, "All inmates sentenced to life or death are placed into this status with the same restrictions."[44]

---

[38] *Id.*, Ex. VII; DSUF, Ex. 2 at 32.

[39] *Id.*

[40] *Id.*

[41] *Id.*  After his communication with the medical department on August 2, Anderson's cell number changed from D-101 to D-124, as listed on this grievance form and all forms thereafter.

[42] *Id.*

[43] *Id.*

[44] *Id.*

*5. Third Warden Communication*

In his third communication to the Warden, dated August 14, 2012,[45] Anderson requested permission for a haircut and shave, despite his inability to pay for these services out of his prisoner account.[46]  On August 17, 2012, the Warden approved the request, informing Anderson that there would be a negative balance on his account, and if funds were deposited at a later date then the appropriate amount would be deducted.[47]

*6. Second Grievance Form*

Anderson's second grievance, dated August 15, 2012, complains of not receiving psoriasis medication after various requests and a nurse visit.[48]  Lieutenant Castro responded by detailing that Anderson had seen a medical provider on July 26, 2012, he was scheduled to see a doctor for "follow up and to discuss medication," and he was currently receiving a "topical corticosteroid."[49]

After the capital murder case ended, Anderson returned to SCI-Huntington on August 22, 2012.[50]

## Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of

---

[45] *Id.*, Ex. VIII; DSUF, Ex. 2 at 35.

[46] *Id.*

[47] *Id.*

[48] *Id.*, Ex. IX; DSUF, Ex. 2 at 33.

[49] *Id.*

[50] Defs'. Mot. to Dismiss Pl.'s Am. Compl. at 3; Am. Compl., Ex. X.

law."  Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party.  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which he bears the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## Discussion

The Eighth Amendment proscribes the infliction of cruel and unusual punishment.  U.S. Const. amend. VIII.  Prison conditions are cruel and unusual if they deprive inmates of basic human needs and life's necessities.  *Tillman v. Lebanon Cnty. Corr. Facility,* 221 F.3d 410, 417-18 (3d Cir. 2000).  The test is whether the conditions,

together or alone, function to deprive the inmate "of the minimal civilized measure of life's necessities." *Id.* (citation omitted).

To state a claim challenging conditions of confinement, an inmate must allege facts that would, if proven, establish that the deprivation of his right was objectively serious and the prison official had a sufficiently culpable state of mind – that is, that the official acted with deliberate indifference. *Beers-Capitol v. Whetzel,* 256 F.3d 120, 125 (3d Cir. 2001) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

Whether the harm is objectively serious is measured by society's view of the risk to the prisoner's health and safety, that is, "whether 'it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 257 (3d Cir. 2010) (quoting *Helling v. McKinney,* 509 U.S. 25, 36 (1993)) (emphasis in original).  Restrictive or harsh conditions are part of prison life. *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981).  Only conditions that deprive the prisoner of one of life's necessities, such as food, water, clothing, shelter, and medical care are unconstitutional.  *Griffin v. Vaughn,* 112 F.3d 703, 709 (3d Cir. 1997).  Thus, unless the condition is objectively serious, there is no unconstitutional deprivation.

A condition, by itself, may not present an objectively serious condition rising to the level of a constitutional violation; but, in combination with other conditions, it may if together they result in the "deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

Anderson's claims are not sufficiently serious to amount to the type of extreme deprivation that the Eighth Amendment prohibits.  The prison conditions in the restricted housing unit were not, neither singularly nor collectively, cruel and unusual.

1.  *Nutri-loaf Diet*[51]

Anderson's dietary restrictions do not make out an objectively serious deprivation.  Prisons must provide nutritionally adequate food.  *Laufgaus v. Speziale,* 263 Fed. App'x 192, 198 (3d Cir. 2008) (non-precedential).  A prisoner's diet must be adequate to maintain health and served in a sanitary manner.  *Maldonado v. McFaden,* No. 94-1477, 1994 U.S. Dist. LEXIS 16837, at *11 (E.D. Pa. Nov. 23, 1994).  It need not be appetizing.  *Jones v. Beard,* No. 10-5544, 2011 WL 3611470, at *8 (E.D. Pa. Aug.16, 2011) (citation omitted).

A diet comprising nutri-loaf is not in and of itself cruel and unusual punishment.  *See id.* (citations omitted); *Gannaway v. Berks Cnty. Prison,* No. 09-4501, 2011 WL 1196905, at *4-5 (E.D. Pa. Mar. 31, 2011), *aff'd,* 439 Fed. App'x 86, 88-89 (3d Cir. 2011); *Maldonado,* 1994 U.S. Dist. LEXIS 16837, at *11; *Collins v. Klotz,* No. 92-3772, 1994 WL 371479, at *4 (E.D. Pa. June 24, 1994).[52]  In *Gannaway*, the inmate had been on a restricted diet consisting of nutri-loaf three times a day, five days per week.  2011 WL 1196905, at *4.  Stressing that the inmate suffered no serious ill effects from the diet and made no allegations that the diet was nutritionally inadequate, the Court found that serving nutri-loaf to a prisoner was not cruel and unusual punishment because it did not deprive him of his basic needs.  *Id.* at *5.

Anderson does not assert that the nutri-loaf diet had serious ill effects on his health or that it was nutritionally inadequate.   He simply found it unappetizing.

---

[51] The defendants refer to this food as "nutra-loaf" while Anderson calls it "meal loaf."

[52] These holdings comport with those of courts in other circuits that have considered the issue. *See, e.g., Gates v. Huibregtse,* 69 Fed. App'x 326, 327-28 (7th Cir. 2003); *LeMaire v. Maass,* 12 F.3d 1444, 1455-56 (9th Cir. 1993); *Adams v. Kincheloe,* 743 F. Supp'l 1385 (E.D. Wash. 1990).

Anderson does not dispute, as stated by the defendants, that nutri-loaf is nutritionally equivalent to meals served to other prisoners.[53]   Nor has he demonstrated that the diet posed a serious risk to his health.   Thus, he has not made out a sufficiently serious deprivation giving rise to a constitutional violation.[54]

### 2.  Mattress Restriction

Denying inmates a mattress for limited time periods is not a deprivation of a minimal standard of living and does not constitute cruel and unusual punishment.   *See, e.g.*, *Williams v. Campbell,* No. 07-885, 2008 WL 2816089, at *4 (E.D. Pa. July 18, 2008) ("[N]umerous courts in this circuit have concluded that the failure to provide an inmate with a mattress for a limited number of days does not constitute cruel and unusual punishment.") (citing *Schaeffer v. Schamp,* No. 06-1516, 2008 WL 2553474, at *6 (W.D. Pa. June 25, 2008); *Castro v. Chesney,* No. 97-4983, 1998 WL 767467, at *8 (E.D. Pa. Nov. 3, 1998); *Collins*, 1994 WL 371479, at *5).   The removal of a mattress or bedding supplies for short periods of time "is not sufficient to constitute 'wanton and unnecessary infliction of pain.'"   *Castro,* 1998 WL 767467, at *8 (quoting *Rhodes,* 452 U.S. at 347).

In *Gannaway,* the Court considered an inmate's claim of cruel and unusual punishment where his mattress was removed from his cell for sixteen hours during the day.   2011 WL 1196905, at *6.   The Court held that taking an inmate's mattress away

---

[53] DSUF, ¶ 9.

[54] Anderson was not on a nutri-loaf diet the entire time he was in the Berks County Jail.  After he complained to the officials through the grievance process, he was given regular meals.  *See* DSUF, ¶¶ 17, 21.

during daytime hours is not cruel and unusual punishment if the inmate is given a mattress for an adequate number of hours at night to sleep.  *Id.*  We agree.

Here, the mattress restriction does not amount to a sufficiently serious deprivation of life's necessities.  Anderson was provided a mattress for ten hours each night.  The denial of a mattress may have resulted in some discomfort during daytime hours.  It did not threaten his health.  Thus, it is not cruel and unusual under the Eighth Amendment.

> 3.  *Hygiene Restrictions*

The lack of regular shower and shaving privileges, while admittedly unpleasant, does not constitute a deprivation of minimal standards of living.  *See Fortune v. Hamberger*, 379 Fed. App'x 116, 122 (3d Cir. 2010) (upholding decision stating that the inability to adequately shower and exercise for a period of fifteen days did not violate the Eighth Amendment) (non-precedential); *see also Williams v. Lehigh Dep't of Corr.*, 79 F. Supp. 2d 514, 519 (E.D. Pa. 1999) (holding restrictions of two showers and two shaves per week did not violate the Eighth Amendment).  Anderson's daily confinement sheet shows that he was allowed to shower seven times during the four weeks he was housed at the Berks County Jail.[55]  Anderson has made no claim that his inability to shower or shave daily created any risk to his health or safety.

---

[55] Defs'. Statement of Undisputed Facts in Support of Mot. Summ. J. ("DSUF"), Ex. 2 at 39-40 (Daily Confinement Sheet).

### 4. Darkness

Anderson's allegations concerning the lighting conditions in his cell fail to create a genuine issue of fact.  Anderson acknowledges that his cell was lighted for three hours during the evening.[56]  The defendants have presented demonstrative evidence that his cell had a window that allowed natural light into the cell from about 6:00 a.m. to 8:30 p.m.[57]

Although various courts have recognized that the Eighth Amendment requires a minimum level of illumination,[58] we are aware of no court that has found that fourteen hours of natural light coupled with a temporary restriction of three hours of artificial light per day violates the Constitution.  Furthermore, Anderson fails to allege that the lighting conditions jeopardized his health, and he does not allege that the level of illumination during the three hours that artificial light was provided was inadequate.

### 5. Cold and Blanket

Anderson alleges that he was exposed to extreme temperatures, but he did not point to any evidence to support this allegation.  Of the three communication forms he sent to the Warden, he only mentioned that he was in a "cold cell" in the first communication and did not complain of a cold cell temperature in his grievance forms.[59]

---

[56] Am. Compl. at 13.

[57] Defs'. Supp'l Statement, Exs. 3 and 4 (photos showing windows in D-Unit cells 101 and 124); Ex. 5 (sunrise and sunset calendar for Leesport, Pennsylvania – where Berks County Jail is located).

[58] *See Martino v. Carey*, 563 F. Supp'l 984, 999-1000 (D. Or. 1983) (citing cases); *Hoptowit v. Spellman*, 753 F.2d 779, 783 (9th Cir. 1985), *Bono v. Saxbe,* 620 F.2d 609, 617 (7th Cir.1980); *Ramos v. Lamm,* 485 F. Supp'l 122, 155 (D. Colo.1979), *aff'd in relevant part,* 639 F.2d 559 (10th Cir.1980); *Jones v. Wittenberg,* 323 F. Supp'l 93, 95, 99 (N.D. Ohio 1971), *aff'd sub. nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir.1972); *Dawson v. Kendrick,* 527 F. Supp'l 1252, 1288 (S.D. W.Va.1981).

[59] *See* Am. Compl., Ex. IV (July 27, 2012 Warden communication); DSUF, Ex. 2 at 38..

In his affidavit, the Warden disputes that Anderson was placed in an unusually cold cell.[60]  He states that there are no extremely cold cells at the jail as the air conditioning, which is used for the comfort of inmates and jail staff during the summer, is set at the same temperature throughout the jail.[61]  The defendants claim that all of the cells on Anderson's block were air conditioned at a comfortable level, and that no other inmates in Anderson's unit complained of cold cell temperatures during his confinement.[62]

Cold conditions, either through a single prison condition such as a low cell temperature or through various mutually enforcing conditions, such as low cell temperature and lack of warm clothing, may constitute a violation of the Eighth Amendment.  *Seiter*, 501 U.S. at 304 (identifying "low cell temperature at night combined with a failure to issue blankets" as the kind of mutually enforcing conditions that could rise to the level of a constitutional violation).  Here, Anderson has not presented evidence to show a constitutional deprivation based upon an unusual temperature in his cell.

Anderson has not presented evidence of the temperature in his cell during the period he was confined at the jail.  He claims that he "became ill/sick" with a cold because of the low temperature and that he was given Robitussin and Chlor-Trimeton by the jail nurse for his symptoms.[63]  The defendants have furnished medical records

---

[60] Def's Supp'l Statement, Ex. 6 (Affidavit of George A. Wagner) ¶ 8, ("Wagner Aff.").

[61] *Id.* ¶¶ 8-10.

[62] Def's Supp'l Statement, ¶¶ 55-57; Wagner Aff. ¶¶ 10-11.

[63] Am. Compl. at 14; Pl.'s Supp'l Br. at 4.  In his supplemental brief, Anderson also claims that he became sick because he lacked a blanket.  *Id.*  Anderson's other pleadings indicate that he did have a blanket, but that it was removed from his cell "early each morning," along with his mattress.  Pl.'s Opp. at

confirming that Anderson received these medications and that he had symptoms such as a cough, headache and runny nose.[64]   The records do not show that Anderson attributed his symptoms to the temperature in his cell.  Anderson, who does not allege that his health was substantially affected, was diagnosed by a nurse as having "cold symptoms" and his temperature was not unusually high.[65]   *See Rambert v. Horn,* No. 96-2875, 1996 WL 583155, at *10 (E.D. Pa. Oct. 11, 1996) ("[T]he absence of any ailment other than colds or sore throats militates against characterizing [cell conditions] as objectively serious.") (citing *Benson v. Godinez*, 919 F. Supp. 285, 289 (N.D. Ill. 1996)).

Anderson, although he may have been uncomfortable, has provided no evidence giving rise to a factual dispute regarding whether the temperature in his cell was so cold as to constitute a deprivation of his Eighth Amendment right.   *See Deputy v. Taylor*, No. 02-183, 2003 WL 361216, at *3 (D. Del. Feb. 19, 2003) ("Only in the most extreme cases does the lack of heat rise to the level of a constitutional violation") (citing *Blackiston v. Vaughn*, No. 95-3740, 2002 U.S. Dist. LEXIS 16921, at *8 (E.D. Pa. Aug. 19, 2002)); *see also Peterkin v. Jeffes*, 855 F.2d 1021, 1027 (3d Cir. 1998) (comfortable prisons are not mandated by the constitution) (citing *Rhodes*, 452 U.S. at 349); *Allah v. Ricci*, No. 08-1753, 2012 WL 243570, at *6 (D.N.J. Jan. 25, 2012) (discomfort alone does not amount to an Eighth Amendment conditions claim), *reconsideration denied,*

---

3; Pl.'s Mot. Summ. J. at 2.  In his July 27, 2012 communication to the Warden, he complains not about the lack of a blanket, but only about being allowed one blanket.  Am. Compl., Ex. IV; DSUF, Ex. 2 at 38.

[64] Defs'. Supp'l Statement, Ex. 2 at 34.

[65] *Id.* at 11,12 (Showing Anderson's temperature of 97.6 degrees on July 30, 2012 and 97.9 degrees on August 13, 2012).

No. 08-1753, 2012 WL 4341207 (D.N.J. Sept. 21, 2012) and *aff'd,* No. 12-4095, 2013 WL 3816043 (3d Cir. July 24, 2013).

      6. *Sleep deprivation*

Sleep is a basic human need. *Robinson v. Danberg*, 729 F. Supp. 2d 666, 683 (D. Del. 2010). Under certain circumstances, sleep deprivation may violate the Eighth Amendment. *Id.*; *Alger v. Werner*, 391 F. Supp. 1051, 1052 (M.D. Pa. 1974) (must show deprivation of sleep is detrimental to health to show cruel and unusual punishment). Anderson alleges that three conditions combined to deprive him of sleep: (1) prison officials kicked on his door and yelled at him throughout the night; (2) his cell was kept cold; and (3) he did not have a blanket.[66] These conditions do not amount to an objectively serious deprivation of a basic human need. Anderson has not shown that any sleep disturbance he suffered posed a serious risk to his health.

For purposes of the motion, we accept that Anderson lost sleep. However, there is no evidence that any loss of sleep caused any serious ill effects requiring medical attention or otherwise had a deleterious effect on his health.

Anderson does not allege that he complained in any grievance about being deprived of sleep. He has not produced evidence showing that the defendants were aware that he lost sleep. In none of his grievance forms or communications to the Warden did he complain of losing sleep as a result of the prison conditions.

      7. *Culpability*

Even if he had made out an Eighth Amendment claim, Anderson has not provided evidence sufficient to establish the defendants' culpability. Aside from his bare

---

[66] Am. Compl. at 18-19.

allegations, he has not shown that either defendant "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm."  *Beers-Capitol,* 256 F.3d at 132 (quoting *Farmer*, 511 U.S. at 846).   Although Anderson includes as exhibits to his amended complaint various inmate communication forms and two grievance forms, they do not present evidence that either the Warden or Herman was aware of or disregarded excessive risks to Anderson's health.   A prison official's participation in the grievance process alone does not expose him to individual liability for the conduct underlying the prisoner's grievance.[67]   *See Collins v. Williams,* 575 F. Supp. 2d 610, 615 (D. Del. 2008) (citing cases).

---

[67] Because we conclude that Anderson has failed to show that the defendants deprived him of a constitutional right, we need not address their alternative claim that they are entitled to qualified immunity. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999) (courts should determine qualified immunity after determining whether claimant has alleged deprivation of a constitutional right).

**Conclusion**

Anderson's treatment, including the nutri-loaf diet, the mattress restrictions, hygiene restrictions, cold and dark conditions, sleep disturbance and an alleged cold resulting from his detention do not amount to cruel and unusual punishment.  Because the undisputed facts do not make out a constitutional violation giving rise to a section 1983 cause of action, summary judgment will be granted in favor of the defendants.[68]

---

[68] Anderson contends that he was treated improperly as a result of intending to testify on behalf of the defense in a criminal proceeding.  To prevail on a retaliation claim, a plaintiff must show three things: (1) that the conduct in which he engaged was constitutionally protected; (2) that he suffered "adverse action" at the hands of prison officials; and (3) that his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct.  *Rauser,* 241 F.3d at 333 (adopting *Mount Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).  Anderson's allegations fail to satisfy all three prongs.  While in certain circumstances, testimony is protected by the First Amendment, *see Reilly v. City of Atl. City*, 532 F.3d 216, 231 (3d Cir. 2008), Anderson does not allege that he actually testified.  Further, contrary to his allegation that he was being mistreated because of his potential testimony, jail records show that Anderson was placed in the D-Unit because of security concerns stemming from his conviction for murder and sentence of life imprisonment.  DSUF, Ex. 2 at 50 (Inmate Conduct and Behavior Record); *id.* at 34 (Administrative Segregation Record).  He was treated as any other prisoner serving a life sentence.  *See* DSUF, ¶ 42.